## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BRADLEY SCHWARTZ,<br><br>                Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION LLC, ADVIA CREDIT UNION, CITI BANK, NA., CAPITAL ONE NA, DISCOVER FINANCIAL SERVICES, ONE PROGRESS SERVICES, FB&T/MERCURY FINANCAL, LLC, PNC BANK, NA., AFFIRM, INC., AND COMENITY CAPITAL BANK,<br><br>                Defendants. | **Case No.:**<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Bradley Schwartz ("Plaintiff") by and through the undersigned counsel brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian"), Trans Union LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), (collectively "CRA Defendants"), Advia Credit Union ("Advia"), Citi Bank NA ("Citi Bank"), Capital One NA ("Capital One"), Discover Financial Services ("Discover"), One Progress Services ("One Progress"), FB&T/Mercury Financial, LLC ("FB&T"), PNC Bank, NA ("PNC"), Affirm, Inc ("Affirm"), and Comenity Capital Bank ("Comenity"), (all collectively, the "Furnisher Defendants") and (all collectively, the "Defendants"), alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.

1

## INTRODUCTION

1.      Plaintiff, an identity theft victim, brings this action against the Defendants for violations of the FCRA, 15 U.S.C. § 1681, *et. seq.*

2.      More than twenty million people, just under 10% of all adult Americans, are victims of identity theft each year.[1] Federal law requires that each consumer reporting agency ("CRA") protect victims by taking steps to remove fraudulent information from victims' reports, to ensure that only third parties with permissible purposes see victims' reports and to implement fraud alerts and security freezes at victims' requests. This lawsuit arises from CRA Defendants' refusal to comply with these statutory requirements and resulting failure to protect Plaintiff from identity theft and identity theft consequences.

3.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

4.      However, unfortunately this information has also become readily available

---

[1] <u>Victims of Identity Theft, 2018</u>, 1. U.S. Dept. of Justice, Bureau of Justice Statistics. April 2021, NCJ 256085.

for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the CRA Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

5.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

7.    Since 1970, when Congress enacted the FCRA, 15 U.S.C. § 1681, *et seq.*, federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

8.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system,

3

and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

9.     The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)]

(emphasis added).

10.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to

determine whether information disputed by consumers is inaccurate and record the current

status of the disputed information, or delete the disputed information, before the end of the

30-day period beginning on the date on which the CRA receives the notice of dispute from

the consumer. This mandate exists to ensure that consumer disputes are handled in a timely

manner and that inaccurate information contained within a consumer's credit report is

corrected and/or deleted so as to not prevent said consumer from benefiting from his or her

credit and obtaining new credit.

11.     In light of these important findings and purposes, Congress specifically noted

"a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

12. The FCRA also requires Furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

13. Plaintiff's claims arise out of Experian, Equifax, Trans Union, Advia, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity's plainly deficient reinvestigations considering Plaintiff's disputes and notice that he was a victim of identity theft.

14. Accordingly, Plaintiff brings claims against Experian, Equifax, and Trans Union for: 1) failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and 2) failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact the product of identity theft, and for failing to delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

15.     Plaintiff also brings claims against the CRA Defendants for selling Plaintiff's credit report to third parties without a permissible purpose in violation of the FCRA, 15 U.S.C. § 1681b(a).

16.     Further, Plaintiff also brings claims against the Furnisher Defendants, for failing to conduct a reasonable investigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of identity theft, and for failing to delete the disputed information from Plaintiff's credit file, in violation of FCRA, 15 U.S.C. § 1681s-2b.

17.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq*., as described herein.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

6

## PARTIES

20.     Plaintiff is a natural person of Fredonia, Wisconsin, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

21.     Experian is a limited liability company with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Wisconsin, including within this District.

22.     Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309, and is authorized to do business in the State of Wisconsin, including within this District.

23.     Trans Union is a limited liability company with a principal place of business located at 555 W. Adams Street, Chicago, IL 60661, and is authorized to do business in the State of Wisconsin, including within this District.

24.     The CRA Defendants are each a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Each CRA Defendant is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d)) to third parties.

25.     The information that the CRA Defendants collect, maintain, and sell includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. The CRA Defendants also collect consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

7

26.    The CRA Defendants collect and maintain such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether the CRA Defendants collect and maintain information about them. Not only that, but consumers cannot remove information that the CRA Defendants collect and maintain about them from the CRA Defendants databases. Further, the CRA Defendants sell that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that the CRA Defendants sell.

27.    Defendant, Advia is a loan servicer with its principal place of business located at 10000 West Main St. Kalamazoo, MI 49009, who regularly transacts business within the state of Wisconsin. Advia is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA. Further, Advia is a "person" as defined by FCRA 1681a(b).

28.    Advia is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Advia, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

8

29.     Defendant, Citi Bank is a loan servicer with its principal place of business located at 388 Greenwich St, New York, NY 10013, who regularly transacts business within the state of Wisconsin. Citi Bank is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Citi Bank is a "person" as defined by FCRA 1681a(b).

30.     Citi Bank is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Citi Bank, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

31.     Defendant, Capital One is a loan servicer with its principal place of business located at 1680 Capital One Drive, McLean, VA 22102, who regularly transacts business within the state of Wisconsin. Capital One is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Capital One is a "person" as defined by FCRA 1681a(b).

32.     Capital One is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher

9

Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Capital One, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

33.     Defendant, Discover is a loan servicer with its principal place of business located at 2500 Lake Cook Road, Riverwoods, IL 60015, who regularly transacts business within the state of Wisconsin. Discover is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Discover is a "person" as defined by FCRA 1681a(b).

34.     Discover is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Discover, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

35.     Defendant, One Progress is a loan servicer with its principal place of business located at 2795 E Cottonwood Pkwy Ste 100 Salt Lake City, UT, 84121, who regularly transacts business within the state of Wisconsin. One Progress is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, One Progress is a "person" as defined by FCRA 1681a(b).

36.     One Progress is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as One Progress, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

37.     Defendant, FB&T is a loan servicer with its principal place of business located at 520 Sixth St, Brookings, South Dakota 57006, who regularly transacts business within the state of Wisconsin. FB&T is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, FB&T is a "person" as defined by FCRA 1681a(b).

38.     FB&T is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as FB&T, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

39.     Defendant, PNC is a loan servicer with its principal place of business located at 300 Fifth Ave, Pittsburgh, PA 15222, who regularly transacts business within the state of Wisconsin. PNC is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, PNC is a "person" as defined by FCRA 1681a(b).

40.     PNC is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as PNC, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal

obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

41.     Defendant, Affirm is a loan servicer with its principal place of business located at 650 California St, San Francisco, CA 94108 who regularly transacts business within the state of Wisconsin. Affirm is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b), and other sections of the FCRA.  Further, Affirm is a "person" as defined by FCRA 1681a(b).

42.     Affirm is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Affirm, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

43.     Defendant, Comenity is a loan servicer with its principal place of business located at 2795 E Cottonwood Pkwy Ste 100 Salt Lake City, UT, 84121, who regularly transacts business within the state of Wisconsin. Comenity is an entity which engages in the practice of furnishing consumer information to consumer reporting agencies, and is therefore a "furnisher of information" as contemplated by 15 U.S.C. § 1681s-2(a) & (b),

13

and other sections of the FCRA. Further, Comenity is a "person" as defined by FCRA 1681a(b).

44. Comenity is a "Furnisher" as defined in 12 CFR 1022.41. The Furnisher Defendant regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Comenity, is an entity that reports information about consumers to consumer reporting agencies, which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld & followed pursuant to 15 U.S.C. §1681s-2b of the FCRA.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

45. The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

46. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

47. Specifically, the statute was intended to ensure that "consumer reporting

agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

48. Congress also recognized that CRAs such as the Credit Bureau Defendants "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

49. For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

50. The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

51. The third form of protection the FCRA provides for identity theft victims is a "security freeze," which a consumer can request from nationwide CRAs such as the CRA Defendants here.

52. The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may **only** release a consumer report to a person "which it has reason to believe...intends to use the information in connection with a credit transaction involving the consumer on whom the information is to

be furnished..." 15 U.S.C. § 1681b(a). When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user is making a firm offer of credit. 15 U.S.C. § 1681b(c). No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. 15 U.S.C. § 1681e(a).

53.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

54.     Similarly, the FCRA also imposes a duty upon the Furnishers, such as the Furnisher Defendants, to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. (15 U.S.C. § 1681s-2b).

55.     The FCRA provides consumers with a private right of action against consumer reporting agencies, such as the CRA Defendants, and data furnishers such as the Advia, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity, that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## FACTUAL ALLEGATIONS

**Identity Theft Incident**

56.     Upon information and belief, in or around February 2023, a fraudulent account was opened with non-Defendant Synchrony Bank through Lowes using the Plaintiff's personal identifying information.

57.     In or around February 2023, a fraudulent account was opened with Defendant, Discover Card using the Plaintiff's personal identifying information.

58.     Upon information and belief, in or around March 2023, an existing account with the Defendant, Citi Bank through Best Buy was tampered with using the Plaintiff's personal identifying information.

59.     Upon information and belief, in or around March 2023, an existing account with Defendant, Citi Bank through Home Depo was tampered with using the Plaintiff's personal identifying information.

60.     Upon information and belief, in or around March 2023, an existing account with Defendant, Capital One Bank was tampered with using the Plaintiff's personal identifying information.

61.     Upon information and belief, in or around March 2023, an additional existing account with Defendant, Capital One Bank was tampered with using the Plaintiff's personal identifying information.

62.     Upon information and belief, in or around March 2023, an existing account with non-Defendant, Synchrony Bank through Amazon was tampered with using the Plaintiff's personal identifying information.

63.     Upon information and belief, in or around April 2023, an existing account with Defendant, Advia Credit Union was tampered with using the Plaintiff's personal identifying information.

64.     Upon information and belief, in or around April 2023, an existing account with Defendant, PNC Bank was tampered with using the Plaintiff's personal identifying information.

65.     Upon information and belief, in or around July 2023, a fraudulent account was opened with non-Defendant, Synchrony Bank using the Plaintiff's personal identifying information.

66.     Upon information and belief, in or around July 2023, an additional fraudulent account was opened with non-Defendant, Synchrony Bank using the Plaintiff's personal identifying information.

67.     Upon information and belief, in or around August 2023, a fraudulent account was opened with non-Defendant, Synchrony Bank through Sleep Number using the Plaintiff's personal identifying information.

68.     Upon information and belief, in or around May 2024, an existing account with non-Defendant, Synchrony Bank through Sams Club was tampered with using the Plaintiff's personal identifying information.

69.     Upon information and belief, in or around July 2024, an existing account with Defendant, Comenity Capital Bank through King Size was tampered with using the Plaintiff's personal information.

70.     Upon information and belief, in or around July 2024, an existing account with Defendant, FB&T was tampered with using the Plaintiff's personal information.

71.     In or around September 2024, a fraudulent account was opened with Defendant, Comenity Capital Bank through Ikea using the Plaintiff's personal identifying information.

72.     Upon information and belief, in or around September 2024, a fraudulent account was opened with non-Defendant, Synchrony Bank through Fleet Farm using the Plaintiff's personal identifying information.

73.     Upon information and belief, in or around September 2024, a fraudulent account was opened with non-Defendant, Synchrony Bank through HFT using the Plaintiff's personal identifying information.

74.     Upon information and belief, in or around September 2024, a fraudulent account was opened with non-Defendant, Synchrony Bank through Kohls using the Plaintiff's personal identifying information.

75.     Upon information and belief, in or around September 2024, an existing account with Defendant, Capital One Bank was tampered with using the Plaintiff's personal identifying information.

76.     Upon information and belief, in or around September 2024, a fraudulent account was opened with Defendant, One Progress Services LLC through One Pay using the Plaintiff's personal identifying information.

77.     Upon information and belief, in or around September 2024, an existing

account with Defendant, Comenity Capital Bank through Kay Jewelers was tampered with using the Plaintiff's personal information.

78. Upon information and belief, in or around October 2024, a fraudulent account was opened with Defendant, Affirm Inc through New Egg using the Plaintiff's personal identifying information.

79. Plaintiff was unaware of these fraudulent accounts until he applied for a lease in 2025.

80. Plaintiff discovered these fraudulent accounts in or around September 2025.

81. Plaintiff was denied due to numerous late payments and charges as a result of these fraudulent credit accounts taken out in his name.

82. In or around September 2025, Plaintiff went to apply for a lease and was alerted that there were 26 accounts opened or tampered with.

83. After reviewing the Plaintiff's credit reports, he noticed fraudulent and tampered accounts through Advia, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity.

84. Shortly after learning of the fraudulent account, the Plaintiff filed a police report with the Camden Police Department.

85. Plaintiff also completed a Federal Trade Commission Identity Theft Affidavit.

86. Shocked at learning of the fraudulent and tampered accounts being taken out in his name, the Plaintiff went on to dispute the fraudulent account on his credit reports.

87.    In or around October 2025, Plaintiff sent a letter to the three credit reporting agencies disputing the fraudulent accounts.

88.    Within each dispute to the credit reporting agencies, Plaintiff included the police report and a FTC Fraud Affidavit detailing all of the fraudulent information on his credit reports. Plaintiff also included a self-prepared letter detailing all of the fraudulent and tampered accounts.

89.    Plaintiff additionally included with each dispute the lease agreements for 148 Wall St and 2051 Blythewood Crossing.

90.    Within the FTC Fraud Affidavit, the Plaintiff included his name, date of birth, social security number, driver's license number, address, phone number, and email address.

91.    The Plaintiff also had his signature on the FTC Fraud Affidavit notarized by a notary public.

92.    Within the FTC Report, the Plaintiff included the fraudulent Jefferson Capital ("Jefferson"), Advia, Synchrony Bank ("Synchrony"), Portfolio Recovery Associates ("Portfolio"), Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity account numbers and details regarding the fraudulent accounts.

93.    There were many accounts within the credit reports that were not opened by the Plaintiff, and others that previously had a $0 balance which were now reporting a balance that was not incurred by the Plaintiff, nor with the Plaintiff's consent.

94.    The Plaintiff requested that the information related to the identity theft be deleted from his credit file.

95. Plaintiff requested that the credit reporting agencies reinvestigate the disputed information and correct their reporting.

96. Upon information and belief, the credit reporting agencies forwarded the Plaintiff's dispute to each Credit Furnisher listed within the dispute letter and within this Complaint.

97. Upon information and belief, each Credit Furnisher listed within the dispute letter (and within this Complaint) received the dispute letters that were forwarded by the credit reporting agencies.

98. The Plaintiff also contacted numerous of the Furnisher Defendants to dispute the accounts with them.

99. In or around November and December 2025, Discover sent a letter stating the account was valid and not a result of identity theft.

100. In or around November 2025, Home Depot sent a letter stating the account was valid and not a result of identity theft.

101. In or around November 2025, One Progress sent an email stating the account was valid and not a result of identity theft.

102. Through Synchrony's dispute process, they were able to realize that the Sleep Number account was opened as a result of identity theft and ensured that the account was closed.

103. Synchrony acknowledged that this account was the result of identity theft, despite denying other accounts being opened or utilized on the Plaintiff's credit file that

were denied for fraud.

104.    Upon information and belief, the Plaintiff disputed his fraudulent Synchrony account (9972) in or around November 2025.

105.    Upon information and belief, Synchrony received the dispute.

106.    Through Synchrony's dispute process, they were able to realize that the account was opened as a result of identity theft and ensured that the account was closed.

107.    Synchrony acknowledged that this account was the result of identity theft, despite denying other accounts being opened or utilized on the Plaintiff's credit file that were denied for fraud.

108.    Through Synchrony's dispute process, they were able to realize that a "New Egg" account was opened as a result of identity theft and ensured that the account was closed.

109.    Synchrony acknowledged that this account was the result of identity theft, despite denying other accounts being opened or utilized on the Plaintiff's credit file that were denied for fraud.

110.    Through Synchrony's dispute process, they were able to realize that a HFT account was opened as a result of identity theft and ensured that the account was closed.

111.    Synchrony acknowledged that this account was the result of identity theft, despite denying other accounts being opened or utilized on the Plaintiff's credit file that were denied for fraud.

112.    Through Synchrony's dispute process, they sent a letter stating the Lowe's

account was valid and not a result of identity theft.

113. Through Synchrony's dispute process, they sent a letter stating the account ending in 3310 was valid and not a result of identity theft.

114. Through Synchrony's dispute process, they sent a letter stating the Amazon account was valid and not a result of identity theft.

115. Through Synchrony's dispute process, they sent a letter stating the Sams Club account was valid and not a result of identity theft.

116. Through Synchrony's dispute process, they sent a letter stating the Fleet Farm account was valid and not a result of identity theft.

117. Upon information and belief, non-party Synchrony, Jerrferon, and Portfolio removed all fraudulent trade lines from the Plaintiff's credit reports, thus acknowledging the identity theft.

118. Upon information and belief, the remaining furnisher Defendants did not remove the negative trade lines from the Plaintiff's credit reports.

**Trans Union's Dispute Reinvestigation**

119. Upon information and belief, the Plaintiff disputed his Trans Union credit report with Trans Union in or around September 2025.

120. Upon information and belief, Trans Union received the Plaintiff's dispute that disputed the fraudulent Jefferson, Advia, Synchrony, Portfolio, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity accounts.

121. Upon information and belief, Trans Union sent the Furnisher Defendants

each a separate ACDV pursuant to Plaintiff's 2025 dispute to Trans Union.

122. Upon information and belief, each Furnisher Defendant received Trans Union ACDV and did not adequately investigate Plaintiff's dispute.

123. Upon information and belief, Trans Union allowed (and continues to report) the fraudulent accounts to remain on his TransUnion report after the 2025 dispute.

124. In or around October 29, 2025, the Plaintiff mailed Trans Union a dispute letter via certified mail.

125. Upon information and belief, Trans Union received Plaintiff's 2025 dispute letter.

126. On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Capital One account was "DELETED: The disputed item was removed from your credit report."

127. On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Comenity Ikea account was "DELETED: The disputed item was removed from your credit report."

128. On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Jefferson account was "DELETED: The disputed item was removed from your credit report."

129. On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent One Progress account was "DELETED: The disputed item was removed from your credit report."

130.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Portfolio account was "DELETED: The disputed item was removed from your credit report."

131.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony Amazon account was "DELETED: The disputed item was removed from your credit report."

132.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony account was "DELETED: The disputed item was removed from your credit report."

133.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony HFT account was "DELETED: The disputed item was removed from your credit report."

134.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony Lowes account was "DELETED: The disputed item was removed from your credit report."

135.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony Fleet Farm account was "DELETED: The disputed item was removed from your credit report."

136.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony New Egg account was "DELETED: The disputed item was removed from your credit report."

137.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony Sams Club account was "DELETED: The disputed item was removed from your credit report."

138.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Synchrony account was "DELETED: The disputed item was removed from your credit report."

139.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Advia account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

140.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Citi Bank Best Buy account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

141.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Capital One account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

142.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the additional fraudulent Capital One account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

143.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Comenity King Size account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

144.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Comenity Kay Jewelers account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

145.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Discover account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

146.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent FB&T account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

147.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent PNC account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

148.    On or about November 27, 2025, Trans Union sent Plaintiff a letter stating that the fraudulent Citi Bank Home Depot account was "VERIFIED AS ACCURATE AND UPDATED: The disputed item was verified as accurate."

149.    Upon information and belief, the fraudulent accounts are still appearing on the Plaintiff's Trans Union credit report.

150.    Trans Union failed to adequately review all of the information provided to it by Plaintiff.

151.    Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant

information available to it, and failing to recognize that the disputed information was the product of identity theft.

## Experian's Unreasonable Dispute Reinvestigation

152.    Upon information and belief, the Plaintiff disputed his Experian credit report with Experian in or around October 2025.

153.    On or about October 29, 2025, the Plaintiff mailed Experian a dispute letter via certified mail.

154.    Upon information and belief, Experian received the Plaintiff's dispute letter.

155.    Upon information and belief, Experian received the Plaintiff's dispute that disputed the fraudulent Jefferson, Advia, Synchrony, Portfolio, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity accounts.

156.    Upon information and belief, Experian sent the Furnisher Defendants each an ACDV pursuant to Plaintiff's October 2025 dispute to Experian.

157.    Upon information and belief, the Furnisher Defendants received Experian ACDV and did not adequately investigate Plaintiff's dispute.

158.    Upon information and belief, Experian allowed the fraudulent accounts to remain on his Experian report after the 2025 dispute.

159.    Upon information and belief, the fraudulent accounts are still appearing on the Plaintiff's Experian credit report.

160.    Experian failed to adequately review all of the information provided to it by Plaintiff.

161. Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information was the product of identity theft.

**Equifax's Unreasonable Dispute Reinvestigation**

162. On or about October 29, 2025, the Plaintiff disputed his Equifax credit report with Equifax in or around October 2025.

163. Upon information and belief, Equifax received the Plaintiff's 2025 dispute that disputed the fraudulent Jefferson, Advia, Synchrony, Portfolio, Citi Bank, Capital One, Discover, One Progress, FB&T, PNC, Affirm, and Comenity accounts.

164. Upon information and belief, Equifax sent each Furnisher Defendant an ACDV pursuant to Plaintiff's 2025 dispute to Equifax.

165. Upon information and belief, the Furnisher Defendant received Equifax's 2025 ACDV and did not adequately investigate Plaintiff's dispute.

166. Upon information and belief, Equifax received Plaintiff's 2025 dispute letter.

167. On or about November 5, 2025, Equifax sent Plaintiff a letter requesting more identifying documents.

168. The Plaintiff included with his dispute a completed and notarized FTC Fraud Affidavit with all of his identifying information such as his name, date of birth complete social security number, driver's license number, current address, current phone number, and current email, along with a completed police report and lease agreement.

169. The Plaintiff's 2025 dispute letter included all of the relevant identifying information needed to identify him, including his name, date of birth, social security number, and his address.

170. On or about November 18, 2025, Plaintiff called Equifax to confirm they had received all necessary documents, they confirmed they had received them.

171. On or about November 13, 2025, Equifax sent Plaintiff a letter stating that the fraudulent One Progress account was "removed from your Equifax credit file."

172. Upon information and belief, the fraudulent accounts are still appearing on the Plaintiff's Equifax credit report.

173. Equifax failed to adequately review all of the information provided to it by Plaintiff.

174. Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed information was the product of identity theft.

**The CRA Defendants' Method for Considering Consumer Credit Report Disputes**

175. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

176. The credit bureaus, Equifax, Experian, Trans Union, and non-party Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to

create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

177. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

178. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

179. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

180. Metro II codes are used on an industry wide form known within the credit industry as an ACDV electronic form.

181. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

182. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

183. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit information disputed by a consumer.

184. The data furnishers, like the Furnisher Defendants, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit information and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit accounts information are accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

185. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed information was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the accounts entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**The Furnisher Defendants' Unreasonable Dispute Investigations**

186. Upon information and belief, Furnisher Defendant Advia failed to adequately review all of the information provided to them by Plaintiff.

187. Upon information and belief, Furnisher Defendant Citi Bank failed to adequately review all of the information provided to them by Plaintiff.

188. Upon information and belief, Furnisher Defendant Capital One failed to adequately review all of the information provided to them by Plaintiff.

189. Upon information and belief, Furnisher Defendant Discover failed to adequately review all of the information provided to them by Plaintiff.

190. Upon information and belief, Furnisher Defendant One Progress failed to adequately review all of the information provided to them by Plaintiff.

33

191. Upon information and belief, Furnisher Defendant FB&T failed to adequately review all of the information provided to them by Plaintiff.

192. Upon information and belief, Furnisher Defendant PNC failed to adequately review all of the information provided to them by Plaintiff.

193. Upon information and belief, Furnisher Defendant Affirm failed to adequately review all of the information provided to them by Plaintiff.

194. Upon information and belief, Furnisher Defendant Commenity failed to adequately review all of the information provided to them by Plaintiff.

195. Upon information and belief, Furnisher Defendant Advia verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

196. Upon information and belief, non-Defendant Synchrony was able to acknowledge the identity theft and deleted the accounts in response to Equifax, Experian, and Trans Union's ACDVs.

197. Upon information and belief, Furnisher Defendant Citi Bank verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

198. Upon information and belief, Furnisher Defendant Capital One verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

199. Upon information and belief, Furnisher Defendant Discover verified the

disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

200. Upon information and belief, Furnisher Defendant One Progress verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

201. Upon information and belief, Furnisher Defendant FB&T verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

202. Upon information and belief, Furnisher Defendant PNC verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

203. Upon information and belief, Furnisher Defendant Affirm verified the disputed Fraudulent Inquiries as accurate in response to Experian's ACDVs.

204. Upon information and belief, Furnisher Defendant Comenity verified the disputed Fraudulent Inquiries as accurate in response to Equifax, Experian, and Trans Union's ACDVs.

205. Furnisher Defendants violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to recognize that the disputed Fraudulent Inquiries were the product of identity theft.

**Plaintiff Applied for Credit**

**Impact Management Group Denied Plaintiff's Application for a Lease in 2025**

206. In or around September 2025, the Plaintiff was interested in applying for a lease.

207. In or around September 2025, the Plaintiff applied for a lease with Impact Management Group.

208. For Impact Management Group to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided For Impact Management Group with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

209. Upon information and belief in or around September 2025, CRA Defendants sold a credit report about Plaintiff to Impact Management Group in response to Plaintiff's credit application for Impact Management Group lease.

210. Upon information and belief, the information that was provided Impact Management Group in relation to Plaintiff's lease application contained the fraudulent accounts.

211. Upon information and belief, the information that was provided to Impact Management Group in relation to Plaintiff's lease application contained the fraudulent accounts.

212. It was inaccurate for the CRA Defendants to publish information to a third party that contained fraudulent accounts information.

213. The CRA Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

214. The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

## PLAINTIFF APPLIED FOR A CREDIT LIMIT INCREASE IN SEPTEMBER 2025

215. In or around September 2025, the Plaintiff was interested in increasing his credit limit on his American Express card.

216. For American Express to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided American Express with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

217. Upon information and belief in or around September 2025, CRA Defendants sold a credit report about Plaintiff to American Express in response to Plaintiff's credit limit increase.

218. Upon information and belief, the information that was provided to American

Express in relation to Plaintiff's credit limit increase contained the fraudulent accounts.

219.    It was inaccurate for the CRA Defendants to publish information to a third party that contained fraudulent accounts information.

220.    The Plaintiff was denied a credit limit increase in American Express.

221.    The CRA Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

222.    The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

**PLAINTIFF APPLIED FOR A CREDIT LIMIT INCREASE IN JANUARY 2026**

223.    In or around January 2026, the Plaintiff was interested in increasing his credit limit on his American Express card.

224.    For American Express to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided American Express with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

225.    Upon information and belief in or around January 2026, CRA Defendants

sold a credit report about Plaintiff to American Express in response to Plaintiff's credit limit increase request.

226. Upon information and belief, the information that was provided to American Express in relation to Plaintiff's credit limit increase contained the fraudulent accounts.

227. It was inaccurate for the CRA Defendants to publish information to a third party that contained fraudulent accounts information.

228. The Plaintiff was denied a credit limit increase in American Express.

229. The CRA Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

230. The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

**Plaintiff Sustained Damages as a Result of the Defendants' Conduct**

231. Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft.

232. Plaintiff filed a police report regarding the identity theft.

233. Plaintiff filed an FTC Identity Theft Report.

234. Plaintiff disputed with the CRA Defendants.

235. Plaintiff disputed fraudulent information with Furnisher Defendants.

236. Despite Plaintiff's disputes of the Fraudulent accounts which were the product of fraud, Experian Equifax, and Trans Union hardly waivered in their refusal to block the same.

237. Upon information and belief, Experian, Equifax, and Trans Union continue to report the inaccurate accounts on Plaintiff's credit reports.

238. As a result of the Defendants' conduct, Plaintiff sustained severe emotional distress. Specifically, Plaintiff has spent an inordinate amount of time dealing with the stress and anxiety caused by the false reporting from the Defendants.

239. Plaintiff had a surgery scheduled for January 2026, to which he wanted a credit limit increase to be safe, but was unable to obtain such a credit limit increase.

240. Plaintiff regularly sees a doctor for anxiety and each Defendant's refusal to acknowledge that he was the victim of identity theft only furthered his anxiety.

241. Plaintiff suffered from countless nights of poor sleep, no sleep, or interrupted sleep as his mind frequently drifts to thoughts of the issues with his credit report, future issues caused by Defendants, and/or other related matters.

242. Plaintiff was attempting to obtain a lease because he moved back to Wisconsin for a job.

243. Plaintiff wonders if these fraudulent accounts will continue to follow him every time he does apply for any credit or any lease in the future.

244.    Plaintiff reasonably believes that the Furnisher Defendants failed to conduct reasonable investigations with his disputes, failed to have the disputed Fraudulent Accounts removed from Plaintiff's Experian, Equifax, and Trans Union credit files, and in fact, verified the Fraudulent accounts as accurate to Defendant Equifax, Experian, and Trans Union and in so doing inaccurately suggested that Plaintiff was responsible for the Fraudulent Accounts.

245.    Plaintiff reasonably believes that Equifax, Experian, and Trans Union continue to inaccurately publish the Fraudulent Inquiries in Plaintiff's consumer reports.

246.    As a direct result of the CRA Defendants' ardent refusal to remove the disputed Fraudulent Accounts, which were a product of identity theft, the CRA Defendants have continued to saddle Plaintiff with the Fraudulent Accounts which were the product of identity theft.

247.    Further, as a direct result of the Furnisher Defendants' verification of the disputed Fraudulent and tampered accounts, the Furnisher Defendants have continued to saddle Plaintiff with fraudulent accounts which were the product of identity theft.

248.    Due to Defendants' ardent refusal to comply with their respective obligations pursuant to the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he incurred attorney's fees.

249.    Further, and due to Defendants' inexplicable refusal to remove the Fraudulent Accounts from an identity theft victim's credit file, Plaintiff expended countless hours disputing the same, to no avail.

250. Further, upon information and belief, Plaintiff was denied credit due to Defendants' inexplicable refusal to remove the Fraudulent Accounts from his credit file.

251. Further, upon information and belief, Plaintiff was offered less favorable terms on loans that he was approved for due to Defendants' inexplicable refusal to remove the Fraudulent accounts from his credit file.

252. Defendants' conduct disrupted Plaintiff's life.

253. In addition to impacting his work productivity and income, dealing with the consequences of Defendants' conduct has taken Plaintiff away from time he would otherwise have spent with his friends and family. Plaintiff has reasonably lost countless hours suffering and worrying over whether someone would seek to collect the outstanding balances on the Fraudulent Accounts from him.

254. Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes. Further, Plaintiff reasonably believes that the Fraudulent Accounts have negatively impacted and depressed his credit score.

255. At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

256. At all times pertinent hereto, the conduct of Defendants, as well as that of

their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

257.    Plaintiff's ongoing stress and anxiety over the situation, and after repeatedly receiving one non-responsive communication after another from Defendants, Plaintiff feels a surge of panic each time he receives another communication from Defendants. His ongoing stress and anxiety regarding the situation has affected him and his relationships negatively.

258.    CRA Defendants have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA. For example, in the very similar matter of April Hendrix vs. Equifax, et. al., (N.CM.D. C.A. No. 1-16-cv-201), an identity theft victim sued several CRAs, including Experian, Equifax, and Trans Union over their repeated wrongful removal of security freezes, release of her credit reports for impermissible purposes, and refusal to properly reinvestigate disputed identity theft information on her credit reports.

259.    The *Hendrix* suit put Experian, Equifax, and Trans Union on notice several years ago that its policies and procedures for implementing security freezes and handling identity theft victims' requests and disputes were woefully inadequate.

260.    The CRA Defendants have had years of notice in the form of federal lawsuits, despite it all, the CRA Defendants did not take any better steps to protect the Plaintiff here.

261.    The internal policies and procedures of the CRA Defendants do not appear to place any value on its obligations under the FCRA to report credit entries accurately or

to reinvestigate carefully when notified of consumer disputes.

262.    As a standard practice, the CRA Defendants do not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the data furnishers, despite numerous court decisions admonishing this practice. See *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

263.    The Defendants are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Defendants' violations of the FCRA are willful.

264.    The Defendants' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

265.    As a result of the Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating;

44

detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Accounts which was the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the Fraudulent Accounts which were the product of identity theft.

266.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted, questioned and disbelieved by the Defendants.

## COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to
### Assure Maximum Possible Accuracy
### (Equifax, Experian, and Trans Union Only)

267.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein.

268.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

269.    On numerous occasions, Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

270. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, Equifax, Experian, and Trans Union readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff was responsible for the Fraudulent Inquiries.

271. Further, due to the Fraudulent Accounts and Inquiries, Plaintiff suffered adverse action from potential creditors.

272. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

273. Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

274. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

275. As a result of Equifax, Experian and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the Fraudulent Inquiries which were the product of identity theft.

276.  Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted, questioned and disbelieved by Equifax, Experian, and Trans Union.

277.  Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering Equifax, Experian, and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

278.  Plaintiff is entitled to recover attorneys' fees and costs from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Equifax, Experian, and Trans Union Only)

279.  Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

280.  The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a

consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day limitation for the completion of such an investigation. Id.

281.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

282.    On numerous occasions during 2023 and 2024, Plaintiff disputed the inaccurate information with the CRA Defendants and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the Fraudulent accounts and inquiries that were the product of identity theft.

283.    Plaintiff disputed the identity theft information with the Equifax, Experian, and Trans Union to no avail.

284.    Plaintiff supported his disputes with a copy of an FTC Identity Theft Report and a police report..

285.    Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, Equifax, Experian, and Trans Union conducted virtually no investigations of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

286.    Equifax, Experian, and Trans Union's refusal to delete the identity theft information provided credibility to the Fraudulent Inquiries and forced an identity theft

victim to be repeatedly confronted with the evidence of identity theft.

287. Defendant Experian violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

288. Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

289. Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

290. As a result of Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit

from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the Fraudulent Inquiries which were the product of identity theft.

291.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted, questioned and disbelieved by Equifax, Experian and Trans Union.

292.    Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering Equifax, Experian, and Trans Union liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

293.    Plaintiff is entitled to recover attorneys' fees and costs from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct an Investigation of the Disputed Information and Review of all Relevant Information Provided by the Consumer
(Furnisher Defendants: Advia, Citi Bank, Capital One, Discover, One Progress,**

**FB&T, PNC, Affirm, Comenity, Only)**

294.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

295.    The Furnisher Defendants caused the Fraudulent Accounts to be added to Plaintiff's credit file with the national credit bureaus, including but not limited to the CRA Defendants. Those inquiries were the product of identity theft.

296.    Each Furnisher Defendant violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the CRA Defendants; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to the CRA Defendants.

297.    As a result of the Furnisher Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the Fraudulent Inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the Fraudulent Accounts and Inquiries which were the product of identity theft.

298.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted, questioned and disbelieved by the Furnisher Defendants.

299.    Furnisher Defendants conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Furnisher Defendants was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

300.    Plaintiff is entitled to recover attorneys' fees and costs from Furnisher Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

(a)    WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants: Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681;

(b)    An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §§ 1681, *et seq.;*

(c)    An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n and § 1681o; and,

Such other and further relief as this Honorable Court may deem just and proper, including

any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 3rd day of February, 2026.

By: */s/ Matthew McKenna*
Matthew McKenna
WI Bar Number 1136439
Shield Law
237 South St. Unit 110
Waukesha, WI 53186
T: (262) 420-5953
E: matt@shieldlaw.com

*Attorney for Plaintiff,*
*Bradley Schwartz*